THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EAGLE WEST INSURANCE COMPANY,<br><br>                Plaintiff,<br>     v.<br>AMTROL, INC.,<br><br>                Defendant. | CASE NO. C16-0781-JCC<br><br>ORDER ON MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendant Amtrol's motion for summary judgment (Dkt. No. 31). Plaintiff also asks the Court to strike exhibits presented in support of Defendant's motion. (Dkt. No. 38.) Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES Plaintiff's motion to strike and GRANTS in part and DENIES in part Defendant's motion for summary judgment for the reasons explained herein.

## I. BACKGROUND[1]

On May 20, 2015, a leak occurred on the third floor of a condominium complex owned

---

[1] This section, as is appropriate on summary judgment, presents the facts in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

by Cypress Place Condominium Association ("Cypress Place"), causing water damage to multiple units in the complex. (Dkt. Nos. 1-1 at 3, 32-1 at 2.) The leak originated from a water expansion tank—the THERM-X-TROL Model No. ST-5—designed, manufactured, and sold by Defendant Amtrol, Inc. ("Amtrol"). (Dkt. Nos. 6 at 4, 31 at 2.) Water flow into the tank was controlled by a water pressure regulating valve manufactured, supplied, and distributed by Defendant Watts Regulator Co. ("Watts"). (Dkt. Nos. 1-1, 31 at 2.) Plaintiff Eagle West Insurance Company ("Eagle West"), subrogee of Cypress Place Condominium Owner's Association, brought a product liability claim against both Amtrol and Watts for damages resulting from the leak.[2] (Dkt. No. 1-1.)

Water expansion tanks are paired with hot water heaters in domestic and commercial water systems to manage routine changes in pressure and volume resulting from use and temperature change. (Dkt. No. 32-1 at 18.) Expansion tanks contain a sealed-in flexible rubber bladder that separates the internal chamber into water and air sides. When thermal expansion occurs, the bladder compresses into the air side to provide space for increased water volume. (Dkt. No. 31-1 at 21.) The air side of the tank is pre-pressurized to match domestic water pressure and balance expansion, so when pressure decreases, the bladder relaxes. (Dkt. No. 32 at 3.) In systems like the one at Cypress Place, increased water pressure cannot be forced back into the municipal supply line and must be absorbed by the internal system; without an expansion tank or other pressure relief mechanism, a water heater and plumbing system risk unsafe pressure buildup. *Id.* at 20.



---

[2] Watts has since been dismissed from this suit. (Dkt. No. 18.) In this order, the term "Defendant" refers only to Amtrol, Inc.

Amtrol manufactures expansion tanks in a variety of sizes and with a variety of features. Tanks are sized according to the size and temperature setting of the attached hot water tank and system pressure. (Dkt. No. 31 at 3.) The subject ST-5 tank is the smallest model and does not come with features offered on more expensive tanks, such as American Society of Mechanical Engineers ("ASME") certification or a sight glass. (Dkt. No. 31 at 3; Dkt. No. 42 at 11.) The ST-5 is indicated for systems with a 50 gal tank and static supply pressure of 60 psi and has a maximum working pressure of 150 psi. (Dkt. No. 32-1 at 14.) The tank is shipped with a pre-charge in the air side of the tank of 40 psi, which product instructions state must be adjusted at installation to match the system's static water pressure. (*Id*. at 4, 14.) Water pressure at Cypress Place was regulated by a Watts automated control valve ("ACV"). (Dkt. No. 32-1 at 5.) The valve was set to maintain a maximum pressure of 80 psi, but Plaintiff's expert, Kent Engineering ("Kent"), testified that routine pressure on the third floor was between 45 and 60 psi. (Dkt. Nos. 32-1 at 8, 44 at 2.) Kent measured water pressure at the third floor on the day of the leak at 90 and 98 psi. *Id*. At no point in Kent's investigation were pressures measured to be over 123 psi. (*Id*.)

On December 21, 2015, Kent produced a preliminary opinion attributing the tank rupture to an AVC malfunction that allowed over pressurization in the water system. (Dkt. No. 32-1 at 2, 5.) Kent initially reported that excess pressure caused the internal bladder in the Amtrol tank to develop a leak, permitting water to enter and corrode the air side of the tank. *Id*. Kent issued a follow-up report on June 21, 2017, revising its opinion after further laboratory testing of the valve and tank. (Dkt. No. 32-1.) The new report concluded that tank failure was not, in fact, caused by over pressurization in the water system. *Id.* Rather, Kent believed that internal corrosion on the bare air side of the tank chamber began a chain reaction that led the tank to rupture. Air added at installation to balance tank pressure introduced humidity into the air side of the tank, which condensated on the internal tank wall, causing corrosion. The corrosion produced a rough surface at the point of contact with the rubber bladder, eroding the bladder and leading the bladder and seal to fail. Water was then

able to flow freely into the tank's air side, causing further corrosion, and ultimately, tank rupture. (Dkt. No. 32-1 at 9). Based on these findings, Plaintiff's expert opined that the Amtrol ST-5 tank was defectively designed in that it failed to prevent this failure at multiple points. (Dkt. No. 32-1 at 11.)

Plaintiff brought a product liability claim against Defendants Amtrol and Watts alleging the valve and tank were "designed, manufactured and sold . . . in a defective and unreasonably dangerous condition." (Dkt. No. 1-1.) Defendant Watts was dismissed from this action. (Dkt. No. 18.) Defendant Amtrol now moves for summary judgement on Plaintiff's product liability claims. (Dkt. No. 31.)

## II. DISCUSSION

### A. Summary Judgement Standard

The Court shall grant summary judgment if the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In making such a determination, the Court views the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. The moving party bears the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248-49. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 324.

**B.      Plaintiff's Motion to Strike**

As an initial matter, Plaintiff asserts that all exhibits supporting Defendant's summary judgment motion should be stricken because they are not appropriately authenticated. (Dkt. No. 38.) In reply, Defendant asks the Court to sanction Plaintiff for presenting this "frivolous" argument. (Dkt. No. 42 at 3.)

A party is not required to produce evidence supporting a motion for summary judgment in a form that would be admissible at trial, as long as it can explain the anticipated admissible form of the evidence. *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001); *see* Fed. R. Civ. P. 56(c)(2) commentary to 2010 amendment; *see also Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). The Court is satisfied with Defendant's explanation of how the disputed evidence could be authenticated at trial. (*See* Dkt. No. 42 at 2-3.)

The Court therefore DENIES Plaintiff's motion to strike Defendant's exhibits. (Dkt. No. 38). The Court does not find sanctions appropriate here.

**C.      Washington Product Liability Act**

The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and as such must apply Washington law. *Snead v. Metro Prop & Cas. Ins. Co.*, 237 F.3d 1080, 1090 (9th Cir. 2001). Plaintiff's claim arises under the Washington Product Liability Act ("WPLA"), the exclusive remedy for product liability claims in Washington. *Washington Water Power Co. v. Graybar Elec. Co.*, 774 P.2d 1199, 1203-04 (Wash. 1989). The WPLA imposes liability on a manufacturer for a claimant's harm proximately caused by a product "not reasonably safe as designed" ("defective design") or "not reasonably safe because adequate warnings or instructions were not provided" ("failure to warn"). Wash. Rev. Code § 7.72.030(1). A plaintiff can establish liability for defective design or failure to warn through either a "risk-utility" or "consumer expectations" theory. Wash. Rev. Code § 7.72.030(3); *Kirkland v. Emhart Glass S.A*, 805 F. Supp. 2d 1072, 1076 (W.D. Wash. 2011).

In the instant case, Plaintiff argues both design defect and failure to warn as bases for

product liability, asserting risk utility and consumer expectations theories for both. (Dkt. No. 38 at 7-12.) Defendant moves for summary judgment on the following issues (1) Amtrol's ST-5 tank was reasonably safe as designed, (2) Amtrol provided adequate warning and instructions with the tank, and (3) any design defect or inadequate warning did not proximately cause Plaintiff's harm. (Dkt. No. 5-6.)

   1. *Defective Design*

Defendant asks the Court to dismiss Plaintiff's claim on the grounds that the Amtrol ST-5 tank was reasonably safe as designed, and asserts that Plaintiff lacks evidence to show otherwise. (Dkt. No. 31.) Plaintiff maintains that the tank rupture resulted from defects in the tank design identified by its expert, including (1) noncompliance with ASME requirements for thin-walled vessel corrosion allowance, (2) lack of a mechanism, such as a sight glass, to allow an ordinary consumer to know if the bladder has failed, (3) failure to secure the bladder and secondary seal in a manner that prevents water from entering the dry side of the tank, (4) failure to protect against corrosion that results when air pressure is added at installation, and (5) failure to design the tank to withstand pressure fluctuations in the water system. (Dkt. No. 38 at 2-3.)

*Risk-utility Test:* The risk-utility test balances a product's likelihood to "cause the claimant's harm or similar harms and the seriousness of those harms," with "the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that a [practical and feasible] alternative design . . . would have on the usefulness of the product." Wash. Rev. Code § 7.72.030(1)(a). The plaintiff bears the burden of showing that risk factors outweigh the adverse effect of an alternative design. *Id*.

Defendant asserts that the ST-5 tank is not defectively designed because the type of harm experienced by Plaintiff is extremely unlikely. (Dkt. No. 31 at 8.) Amtrol receives an average of 30 claims a year for failed thermal expansion tanks out of 500,000 sold. *Id.* Plaintiff answers that the number of annual complaints indicates Defendant knows tank failures like theirs occur, and—considering that seven tanks failed at Cypress Place—it is likely that more tanks fail than

are reported. (Dkt. No. 38 at 10.) Plaintiff characterizes damages from water loss as serious, amounting to over $168000 in this instance alone. *Id*.

Plaintiff identifies two primary alternative designs under the risk-utility theory—the addition of a sight glass, and change in tank material to comply with ASME standards[3]—and points to similar Amtrol tank models with these features. (Dkt. No. 38 at 11.) Defendant characterizes these alternative designs as "speculative," arguing that Plaintiff has not produced evidence regarding practicality, feasibility, or cost. (Dkt. No. 31 at 8.) Defendants further argue that providing a range of models and choices to the consumer does not amount to a design defect. (Dkt. No. 42 at 5.)

A plaintiff may sustain its burden to show that "the challenged product's risk outweighs the adverse effect of an alternative design" by identifying an existing alternative product that "more safely serves the same purpose . . . at a comparable cost and in a similar manner." *Ruiz-Guzman v. Amvac Chemical Corp.*, 7 P.3d 795, 798–99 (Wash. 2000); *see also Lamon, v. McDonnell Douglas Corp.*, 588 P.2d 1346, 1349-50 (Wash. 1979) (comparison of airplane escape hatch with competitor's design "[raised] the inference that a reasonable alternative design which poses less risk [was] feasible); *see also Higgins v. Intex Recreation Corporation*, 99 P.3d 42, 424-25 (Wash. Ct. App. 2004) (a reasonable juror could find that sledding tube without ridges was not reasonably safe as designed where manufacturer offered a tube with ridges that was safer but not significantly slower). Thus, consumer choice of features does not necessarily make a product reasonably safe as designed. The Court does not find convincing Defendant's argument that the plumber made the risk-utility analysis himself when he chose the cheaper model with fewer features. (*See* Dkt. No. 42 at 11.) This line of reasoning would endorse a race to the bottom in safety standards and an economic hierarchy for acceptable risk exposure.

---

[3] Plaintiff's assertion that compliance with ASME standards is a mandatory manufacturing requirement is not supported by evidence in the record. (Dkt. No. 38 at 11.) However ASME standards are relevant evidence of feasibility as industry custom. *See Falk v. Keene Corp.*, 782 P.2d 974, 980 (Wash. 1989).

ORDER ON MOTION FOR SUMMARY
JUDGMENT C16-0781-JCC
PAGE - 7

Viewing the evidence in Plaintiff's favor, a comparison of the Amtrol ST-5 with other tank models could allow a reasonable juror to infer that adding a sight glass and ASME certified materials would make the tank safer without impacting its function or overly burdening the manufacturer.

*Consumer Expectation Test*: To prevail under the consumer expectation test, a plaintiff must show that the product is more dangerous than an "ordinary" or "reasonable" consumer would expect. *Higgins*, 99 P.3d. at 828. It is not necessary to show a feasible alternative design under this theory. *Ruiz-Guzman*, 7 P.3d at 800. Consumer expectations are based on the "class of persons expected to use the product." *Kerzman v. NCH Corp.* at 4.

Plaintiff asserts that the ST-5 tank's design does not meet consumer expectations for safety because its safe life is actually only 5 years, which is below what the ordinary consumer would expect. (Dkt. Nos. 38 at 11, 40 at 5.) Plaintiff's alleged product defects not addressed under the risk-utility test relate to life-span of the product and fit within its consumer expectations theory. Plaintiff bases these consumer expectations on its interpretation of the WPLA's safe life presumption. Under the WPLA, if a product does not specify a safe life, harm "caused more than twelve years after the time of delivery" is presumed to have been caused after the product's useful safe life; a plaintiff must rebut this presumption to impose product liability. Wash. Rev. Code § 7.72.060(1). From this, Plaintiff infers that "it is fair to assume that ordinary consumers in Washington reasonably expect that a product will last at least 12 years" unless otherwise specified. (Dkt. No. 38 at 11.) Defendant characterizes this as an attempt to formulate "an alternative cause of action against any product which fails in under twelve years." (Dkt. No. 42 at 9.) The Court disagrees with this interpretation of Plaintiff's theory, but does not find Plaintiff's inference alone dispositive.

Consumer expectation of product safety is a question for the jury, which can consider Plaintiff's theory along with other relevant evidence. *See Kirkland*, 805 F. Supp. 2d at 1080. Factors considered in determining consumer expectations include the "intrinsic nature of the

product, its relative cost, the severity of potential harm from the claimed defect, and the cost and feasibility of minimizing the risk." *Id.* Industry custom and compliance with nongovernmental and legislative standards may be relevant in certain cases. *Falk*, 782 P.2d at 980.

Whether or not the WPLA presumption is a convincing measure for consumer expectations, viewing the facts in the light most favorable to Plaintiff, there is sufficient evidence in the record for a reasonable juror to determine that the tank did not conform with consumer expectations regarding how long it would safely function. First, the product sits in a utility closet and many ordinary consumers may not know its purpose or functionality. Second, the tank costs only $40, but a consumer may not have purchased or installed the tank and cannot necessarily be expected to infer a short safe life from this factor. (*See* Dkt. No. 32-1 at 25.) Third, the harm in this instance was $168000, an amount a reasonable juror could consider severe. Fourth, the tank does not comply with nongovernmental industry standards for this type of product. (Dkt. No. 39 at 1.) Finally, according to Plaintiff's expert, risk could be minimized by preventing tank corrosion through low cost alternatives such as coating the air chamber or replacing it with stainless steel. (Dkt. No. 32-1.)

The Court finds that Plaintiff has made a showing sufficient for a reasonable juror to find that the tank was unreasonably safe as designed under the risk-utility or consumer expectations test.

### 2. *Defective Design and Proximate Cause*

To establish manufacturer liability under the WPLA for a defective design, a plaintiff must show that the claimed design defects proximately caused its harm. *See* Wash. Rev. Code § 7.72.030(1).

Proximate cause is "a cause which in direct sequence [unbroken by any new independent cause] produces the injury complained of and without which such injury would not have happened." *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10, 21 (Wash. 2007). It is comprised of two elements: cause in fact and legal causation. *Dewar v. Smith*,

342 P.3d 328, 337 (Wash. Ct. App. 2015). Defendant contends that Plaintiff has failed to produce evidence establishing that a defect in the ST-5 tank's design caused its rupture as a factual or legal matter. (Dkt. No. 31 at 13.)

*Cause in Fact:* Cause in fact refers to the "but for consequences of an act"—what "has in fact occurred." *Hartley v. State*, 698 P.2d 77, 83 (Wash. 1985). The "determination of what actually occurred . . . is generally left to the jury." *Id*. Such a question is appropriately determined on summary judgment only when "facts are undisputed" and the resulting inferences are "plain and incapable of reasonable doubt or difference of opinion." *Baughn v. Honda Motor Co., Ltd.*, 727 P.2d 655, 664 (Wash. 1986).

The parties dispute the underlying cause of the tank rupture. Plaintiff presents evidence to show that the tank failure was brought on by the introduction of air into the tank at installation and defects in tank design that failed to prevent subsequent internal corrosion, degradation of the bladder and seal between chambers, and ultimate tank rupture. (Dkt. No. 38 at 3.) Plaintiff argues that if the design (1) didn't require the addition of air at installation, (2) more effectively dealt with fluctuations in water system pressure, (3) took steps to prevent initial corrosion once air was added (using a different material or coating the internal air chamber), (4) provided a sight glass as a failsafe to allow consumers to identify when the internal bladder had failed, or (5) more effectively secured the secondary seal intended to keep the air chamber sealed off from the water chamber after bladder failure, the tank rupture would have been avoided. (Dkt. No. 38.) Rather than asserting a single alternative theory of causation, Defendant challenges the sufficiency of Plaintiff's proof of its theory on multiple grounds.

First, Defendant challenges Plaintiff's assertion that the ST-5 tank failed due to product defects after air was introduced into the dry side of the tank, on the grounds that Plaintiff has not offered evidence showing that the installer added air to the tank or that air, if added, contained humidity. (Dkt. 42 at 6.) Defendant avers that "because Plaintiff cannot show that installation was proper, Plaintiff cannot remove the ultimate failure of the Amtrol, Inc. tank out of the realm

of speculation and conjecture." *Id*.

The burden of production on summary judgment requires a non-movant bearing the burden of proof at trial to put forward facts that could allow a reasonable juror to find in their favor. *See Celotex Corp.*, 477 U.S. at 324. A moving party does not get to dictate what type of proof is offered. It is true that Plaintiff does not offer direct testimony from the installer regarding circumstances of tank installation. However, other evidence in the record, viewed in a light most favorable to Plaintiff, creates a genuine issue of material fact regarding the cause of the tank rupture. Plaintiff's expert performed extensive testing and material analysis on the failed tank, other Amtrol expansion tanks in the building, the AVC valve feeding the subject tank, and the building water system. (Dkt. No. 39-1.) Based on this investigation, experience investigating other expansion tank failures, and Amtrol's own installation instructions, the expert inferred that air added to the tank at installation, coupled with design defects "[led] to the progression of damage and eventual catastrophic failure of the subject tank." *Id*. This evidence is sufficient for a reasonable juror to agree with Plaintiff's theory of causation.

Furthermore, Defendants argue that Plaintiff has not presented evidence sufficient to establish the following "assumptions . . . fundamental to plaintiff's case in chief": (1) the Watts AVC properly maintained incoming water pressure below 80 psi; (2) the plumbing system and tank were annually inspected and maintained; (3) the ST-5 tank was not undersized for the intended use, and (4) the installer properly add air at installation to balance incoming water pressure. (Dkt. No. 42 at 4.)

Plaintiff raises issues of materiality and fact regarding each of these assumptions, citing to its expert's multiple reports and declaration, and its deposition of Amtrol's 30(b)(6) witness. Plaintiff asserts facts as follows: First, expert testimony concluded the tank rupture was not caused by failure of the Watts ACV because water pressure monitored by Plaintiff's expert never reached the ST-5 tank's maximum of 150 psi and water pressure on the floor where the rupture occurred was significantly lower due to gravity. (Dkt. No. 38 at 3.) Second, failure to follow

maintenance recommendations is irrelevant due to Defendant's inadequate instructions. (*Id.* at 4.) Third, choice of tank size did not cause the rupture because water pressure on the third floor was typically between 45 and 60 psi—a level suitable for an ST-5 tank—and, according to product specifications, the ST-5 should have withstood water pressures in the building. (*Id.* at 3.) Finally, although Plaintiff presents no direct evidence regarding tank air pressure adjustment at installation, Plaintiff disputes the relevance of this evidence because pressure fluctuations in water systems are expected, and Defendant does not provide evidentiary support for its claim that under pressurization of the tank shortens bladder lifespan. (*Id.* at 4.) Plaintiff's offer of proof on these issues and its own theory of causation raises genuine disputes of material fact for the jury.

Defendant challenges the sufficiency of Plaintiff's evidence by characterizing Plaintiff's asserted cause in fact as "speculation" and "conjecture" and by attempting to discredit Plaintiff's expert. (Dkt. No. 42 at 6, 7.) Defendant relies on cases in which plaintiffs failed to provide a "satisfactory foundation" for a juror to determine the cause of the accident. (*Id.*); *see Jankleson v. Sisters of Charity House of Providence in Territory of Wash.,* 136 P.2d 720, (Wash. 1943); *Marshall v. Bally's Pacwest, Inc*. 972 P.2d 475 (Wash. Ct. App. 1999). In *Jankleson*, a plaintiff burned by a hospital heating pad supported her product defect claim with evidence that the burn was not caused by hospital negligence and on expert testimony about a different type of heating pad. 136 P.2d at 22-26. In *Marshall* the claimant alleged she fell off a treadmill and hit her head, but had no memory of the accident and produced no evidence to explain what occurred besides her own statement. 972 P.2d at 479.

Plaintiff provides significantly more of a foundation for its theory of causation than offered in the above cases, relying on expert testimony based on thorough testing and examination of the failed tank and building water system. Defendant's attempt to discredit this testimony by challenging expert credibility is not appropriate for summary judgment. (*See* Dkt. No. 42.) Even when a non-movant's evidence "is not highly convincing," if it supports an

ORDER ON MOTION FOR SUMMARY
JUDGMENT C16-0781-JCC
PAGE - 12

inference that movant's negligence was more likely than not the but-for cause of the injury, parties are "entitled to have the trier of fact . . . judge its credibility and persuasiveness." *Beigher v. Kleppe*, 633 F.2d 531, 533 (9th Cir. 1980).

Considering the evidence produced and all inferences therefrom in favor of the nonmoving party, there is a material question of fact as to whether defects in the ST-5 tank design caused the tank to rupture.

*Legal Causation*: Legal causation involves the public policy determination of whether the law should impose liability in this type of situation. *Kirkland*, 805 F.Supp.2d at 1072. Washington courts consider factors such as "logic, common sense, justice, policy, and precedent." *Hartley*, 698 P.2d at 82. Courts also look to the "existence of some direct contact or special relationship between the defendant and the injured party," and legislation protecting a "particular . . . class of persons." *Id*. at 86. By passing the WPLA, the Washington legislature made a policy decision to hold product manufacturers strictly liable for products with unreasonably safe designs and to protect consumers in their relationship with manufacturers. The alleged defects in Defendant's ST-5 tank are not "too remote [or] insubstantial" to impose liability when they are the but-for cause of tank failure and resulting harm. Thus, if a jury finds but-for causation here, there is sufficient evidence for legal causation to attach.

### 3. <u>Superseding Causes</u>

Defendant challenges Plaintiff on the element of proximate cause by asserting both that Plaintiff cannot show that the tank was properly installed and maintained, and that the tank, in fact, was *not* properly installed or maintained. (Dkt. No. 31 at 13-14.) To the extent that Defendant characterizes these alternative theories of causation as superseding causes, this is an affirmative defense, on which Defendant will bear the burden of proof at trial. *See Parkins v. Van Doren Sales, Inc.*, 724 P.2d 389, 394-95 (Wash. Ct. App. 1986). Intervening negligenct acts do not supersede the original actor's negligence as a proximate cause if they are reasonably foreseeable. *Id*. Here, Defendant has not carried its burden of production on this defense and it

seems entirely foreseeable that a plumber would add humid air or fail to properly balance the tank upon installation or that an end user would not receive the instruction manual and not know the tank requires annual inspection. Thus, the Court will not dismiss Plaintiff's design defect claim on this basis.

Defendant's motion for summary judgment on Plaintiff's design defect claim is therefore DENIED.

### a. Failure to Warn

Under the WPLA, a Plaintiff can establish that a product is "not reasonably safe" due to deficiency of warning or instruction by showing that when it was manufactured, "the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the [manufacturer's] warnings or instructions inadequate *and* the manufacturer could have provided the warnings or instructions which the claimant alleges would have been adequate." Wash. Rev. Code § 7.72.030(1)(b). Alternatively, a Plaintiff can show that inadequate warning or instruction made a product "unsafe to an extent beyond that which would be contemplated by the ordinary consumer." *Id*. at § 7.72.030(3). Additionally, a plaintiff must show that the defendant's inadequate warnings proximately caused its injury. *Id*. at § 7.72.030(1). To satisfy this element, a plaintiff must offer sufficient evidence to show that the additional warning would have been heeded if given. *See Ayers by and Through Ayers v. Johnson & Johnson Baby Products Co.*, 818 P.2d 1337, 1340 (Wash. 1991).

Plaintiff argues that its loss "could have been prevented" if Defendant provided adequate instructions or warnings to end users that: (1) the tank required annual maintenance and inspection, (2) over or under pressurization of the tank at installation can lead to a decreased tank lifespan, and (3) the tank should be inspected more frequently or replaced after five years of use. (Dkt. No. 38 at 4, 5.) Defendant counters that the WPLA only requires adequate warnings be provided to the product purchaser, not the end-user. (Dkt. 42 at 8, 9.) Furthermore, even if the Court requires a manufacturer to provide adequate warning to the end-user, Defendant asserts it

has sufficiently done so in literature accompanying the product and on the tank's label. (*Id.*)

The manual provided with the tank at purchase warns "a professional plumber should check the [tank] yearly and more frequently as the system ages," and failure to properly follow installation instructions "may result in excessive strain" or lead to tank failure. (Dkt. No. 32-1.) The manual also indicates that it should be left with the customer. (*Id.*) The tank label itself contains various warnings, including warnings that failure to follow installation instructions can cause a tank rupture, the tank can corrode and weaken over time, the tank must be properly pre-charged to system pressure, and the tank should not be located where leaking could cause damage. (Dkt. No. 32-6.) The label does not instruct the end user to have the tank inspected. (Dkt. No. 38 at 9.)

The Court need not ultimately reach the question of who must be warned or how, because Plaintiff's inadequate warning claim fails on the element of proximate cause. *See Celotex Corp.*, 477 U.S. at 324. A defendant moving for summary judgment can meet its initial burden by showing that the plaintiff lacks evidence to support an essential element of its claim; the burden then shifts to the plaintiff to present such evidence. *Id.* Here, Defendant points to expert testimony and product literature to argue that Plaintiff cannot show a failure to warn proximately caused Plaintiff's injuries. (Dkt. No. 31 at 12–14.) Plaintiff responds that "failure to provide adequate warnings or instruction was the direct and proximate cause of this loss," but does not offer any evidence to show that additional warnings or instruction would have been heeded if provided. (Dkt. No. 38 at 9.) Without any offer of evidence, Plaintiff's statement that it "intends to prove that if given, proper instructions would have been followed" is not sufficient to survive a motion for summary judgment. (*Id.*); *see Celotex Corp.*, 477 US at 323-24 (at the summary judgement stage, the opposing party cannot rest on its pleadings and an affirmative showing is required). Thus, Plaintiff's product liability claim cannot survive summary judgment based on a failure to warn theory.

The Court therefore GRANTS Defendant's motion for summary judgment on Plaintiff's

failure to warn claim.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgement (Dkt. No. 31) is DENIED in part and GRANTED in part. Plaintiff's motion to strike (Dkt. No. 38) is DENIED;

DATED this 19th day of September, 2017.

John C. Coughenour
UNITED STATES DISTRICT JUDGE